THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELIZABETH L. KINSELLA | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 7803 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| | ) | |
| ILLINOIS BELL TELEPHONE CO., | ) | |
| LLC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff Elizabeth Kinsella ("**Kinsella**") brings this lawsuit against her former employer, Defendant Illinois Bell Telephone Co., LLC. ("**Illinois Bell**"), alleging Defendant failed to reasonably accommodate her disabilities, discriminated against her on the basis of her sex, and retaliated against her for exercising her protected rights in violation of the Americans with Disabilities Act ("**ADA**"), 42 U.S.C. § 12101, *et seq*., and Title VII of the Civil Rights Act of 1964 ("**Title VII**"), 42 U.S.C. 2000e, *et seq.* (Dkt. 1). Before the Court is Illinois Bell's motion for summary judgment on all counts under Federal Rule of Civil Procedure 56. For the following reasons, Illinois Bell's motion [57] is granted.

**BACKGROUND**

Defendant Illinois Bell is an Illinois corporation engaged in the business of installing and maintaining AT&T-branded telecommunications and entertainment services. (Dkt. 72 ¶ 1). Plaintiff Elizabeth Kinsella is a former employee of Illinois Bell. (*Id.* ¶ 2). Illinois Bell employed Kinsella as a customer systems technician ("**technician**") in its Network business group from February 7, 1996 through February 17, 2015. (*Id.* ¶ 4). For the period relevant to her claims,

Kinsella worked out of the Company's garage in Westmont, Illinois in a full-time position (the "**Westmont**" or "**Blackhawk**" garage). (*Id.* ¶ 6; Dkt. 79 ¶ 12). Kinsella reported to Manager Kevin Austin through January 2014 and Manager John Begley ("**Mr. Begley**") from February 2014 through her termination. (Dkt. 72 ¶ 8). As Kinsella's direct supervisor, Mr. Begley assigned on-the-job training and allocated equipment to Kinsella and her coworkers at Blackhawk. (*Id.* ¶ 44; Dkt. 79 para 6). Mr. Begley reported to Area Manager Richard Dawson ("**Mr. Dawson**"). (Dkt. 72 ¶ 8).

As a technician, Kinsella was responsible for installing and repairing facilities at customer sites to deliver telecommunications services to customers.[1] (*Id.* ¶ 5). Her work at Illinois Bell was physically demanding. (*Id.* ¶ 5). Illinois Bell's technicians are required to work outdoors in inclement weather; use tools and other equipment; carry and lift heavy equipment; hoist their bodies to ascend and descend poles and ladders; work aloft; and operate Company trucks. (*Id.* ¶ 5). The job description can sometimes call for lifting up to 100 pounds. (*Id.* ¶ 5).

Illinois Bell requires all employees, including Kinsella, to be familiar and comply with the company's Code of Business Conduct ("**COBC**"). (*Id.* ¶ 9). Illinois Bell holds annual trainings on the COBC. (*Id.*) The COBC requires employees to conduct themselves honestly and with integrity, which includes protecting the Company's physical assets and being "personally responsible for the proper use of the Company assets." (*Id.*). The Company's Non-Management Employee Expectations, to which Kinsella was held accountable, provided that Company property

---

[1] On January 1, 2014, Illinois Bell restructured its Network organization to create two separate organizations: Network Infrastructure Business Services ("**NIBS**") and Service Delivery and Assurance ("**SD&A**"). (Dkt. 72 ¶ 28). NIBS technicians performed work on the Company's network infrastructure, including installation and repair of non-accessible cable that required underground, open sheath (exposed wire), and/or air pressure work. (*Id.* ¶ 29). SD&A technicians installed and repaired television, internet, and telephone services at customer sites. (*Id.*). Kinsella requested to be assigned to the NIBS group. (*Id.* ¶ 30). Defendant approved this request and assigned Kinsella to the NIBS group. (*Id.*). The terms and conditions of Kinsella's employment - including her pay, benefits, and seniority – were not affected by this reorganization or reassignment. (*Id.*).

is to be used for Company business only and each employee is personally responsible for the care, protection, tracking, maintenance, and proper storage of Company issued property, such as tools, test sets, laptops, IFDs, cameras, etc. (*Id.* ¶ 11). Kinsella understood that she was not permitted to misuse Company property. (*Id.*).

During her employment with Illinois Bell, Kinsella was eligible for short-term disability benefits under the Company's disability benefits plan. (*Id.* ¶ 12). This plan included wage replacement benefits during medical leaves of absence. (*Id.*). Employees' claims for short-term disability benefits are processed by a third-party administrator operating as the AT&T Integrated Disability Services Center ("**IDSC**"). (*Id.* ¶ 13). The IDSC evaluates claims to determine, based on medical information provided by the employee's health care provider, whether the claimed medical condition qualifies as a "disability" as defined by the plan – namely, whether it is a condition that prevents the employee from performing her job duties. (*Id.*).

## A.     Kinsella's Medical Leaves of Absence and Disability Time Off

Kinsella suffered a workplace injury on April 18, 2011, causing her to take a medical leave of absence. (*Id.* ¶ 15; Dkt. 59-3 at 86:3–21 (explaining that Kinsella fell down a staircase on customer property and injured her left elbow)). She returned to work on August 16, 2012. (Dkt. 72 ¶ 15). Kinsella exhausted her entitlement to leave under the Family and Medical Leave Act ("**FMLA**") during this leave of absence. (*Id.*).

Kinsella suffers from migraines – which at times interfere with her ability to work, and other times even cause her to seek medical attention at a hospital. (Dkt. 79 ¶ 8). In October 2012, Illinois Bell accommodated Kinsella with up to sixteen hours of leave per month for her migraines which she could use in as little as two-hour increments. (Dkt. 72 ¶ 17). Defendant also removed all prior unexcused absences that Kinsella claimed were related to migraine headaches, effectively

expunging her record of any discipline for those absences. (*Id.* ¶ 19). Kinsella was never denied time-off that she needed for her purported migraine headaches. (*Id.* ¶ 20).

### i. Kinsella's Arm Injury & 2013 Request for Accommodations

On January 23, 2013, Kinsella informed Illinois Bell that she suffered another injury. (Dkt. 79 ¶ 11). She explained that she could not use her right arm – including to grip, lift, or carry items, causing work restrictions. (Dkt. 72 ¶ 21). Kinsella could not go to work following her injury. (Dkt. 73-3 at 149:5–6; 149:18). Kinsella provided Defendant a doctor's note indicating a need for these restrictions until her arm healed. (Dkt. 72 ¶ 21; Dkt. 79 ¶ 11). Following the injury to her arm, Kinsella requested to be placed on light duty for at least six weeks, at least until her next doctor's appointment, as a workplace accommodation. (Dkt. 72 ¶ 22). Defendant had no light duty assignments to offer Kinsella at that time in the Blackhawk garage, nor for an undefined period of time as she requested. (*Id.* ¶ 23). Instead, Defendant accommodated Kinsella with time off under its short-term disability benefits plan so that she could receive medical treatment and heal. (*Id.* ¶ 23). Kinsella ultimately took a 52-week leave of absence – from January 23, 2013 through January 28, 2014. (*Id.* ¶ 24). Kinsella received income under Defendant's short-term disability plan for the full 52-week period of her leave. (*Id.* ¶ 24). Kinsella returned to work full time at the end of her leave period. (*Id.* ¶ 25).

### ii. Kinsella's Migraines & 2014 Request for Accommodations

On March 21, 2014, Kinsella submitted a new accommodation request, this time for her migraines, specifically requesting five days off per month. (*Id.* ¶ 38). As in 2012, Defendant approved up to sixteen hours off each month, which could be used in as little as two-hour increments. (*Id.*). Kinsella used one day of accommodation time in August 2014 and two days in September 2014. (*Id.* ¶ 39). In October 2014, Kinsella became eligible and was approved for

intermittent FMLA leave for migraine headaches. (*Id.* ¶ 40). Because she was approved for intermittent FMLA leave, she no longer needed the job accommodation of sixteen hours off per month. (*Id.*). Kinsella thereafter took three days of intermittent leave in October 2014, zero in November 2014, and one day in December 2014. (*Id.*).

**B.    Kinsella's Termination**

Illinois Bell required employees to share equipment as needed and as available. (*Id.* ¶ 36). Additionally, if any technician needed a tent to complete their work, for example, the Company stored extras in the garage for their use. (*Id.* ¶ 35). Kinsella was always able to obtain tools she needed to perform her work assignments while employed at Illinois Bell. (*Id.* ¶ 37).

On December 2, 2014, Kinsella attempted to order a new ground tent and a tent repair kit through Illinois Bell. (*Id.* ¶ 42). Technicians often used these tents to protect them from the elements while they worked. (Dkt. 72 ¶ 34). A new tent is worth more than $400. (Dkt. 73-2 at 136:1–11). Mr. Begley declined her request, finding that Kinsella did not need a new tent. (Dkt. 72 ¶ 42; Dkt. 79 ¶ 17). At the suggestion of another technician, Kinsella grabbed an extra tent from the garage after Begley denied her request. (Dkt. 72 ¶ 42; Dkt. 79 ¶ 18). The tent she took from the garage was old and needed repair, since it had at least a six-inch rip in it. (*Id.* ¶ 18). Two days later, on December 4, Kinsella again ordered a new tent and a repair kit. (Dkt. 72 ¶ 43). Mr. Begley approved Kinsella's second request and later stated that approval was in error. (*Id.*).

The new tent and repair kit eventually arrived. (*Id.* ¶ 44). On or around January 9, 2014, Kinsella took home the used tent and the tent repair kit she ordered on December 4 – without obtaining permission from a manager to do so – and mounted it in her backyard. (*Id.* ¶ 45). In addition to the tent, Kinsella had placed at least two AT&T construction stakes (wooden sticks used at work sites) in her yard. (*Id.* ¶ 46).

On January 14, 2015, Defendant received a tip that Kinsella placed Defendant's property (i.e., the tent and construction stakes) outside her home. (*Id.* ¶ 47). The matter was referred to Defendant's Asset Protection team. (*Id.*). On January 14, an Asset Protection Investigator drove to Kinsella's home and took photographs of the erected tent and stakes in Kinsella's yard. (*Id.* ¶ 48). An Asset Protection Senior Investigator interviewed Kinsella to discuss this matter. (*Id.* ¶ 49). During the interview, Kinsella admitted that she brought the tent home because she needed it for work and wanted to repair several holes in it. (*Id.*). Kinsella also admitted to having Defendant's construction stakes on her property. (*Id.*). As part of the investigation, Defendant's Employee Relations Manager, Jo Maniscalco, contacted the tipster who informed Defendant about the tent and stakes on Kinsella's property. (*Id.* ¶ 50). Inter alia, the tipster explained that he believed Kinsella used the tent as a place to smoke. (*Id.*). A detailed Asset Protection Report was created as a result of the team's investigation.

Mr. Dawson reviewed the information in the report and consulted with his supervisor Director Ellina Simms ("**Ms. Simms**"), Employee Relations Manager Jo Maniscalco, and Labor Relations Manager Jeff Siegel ("**Mr. Siegel**"). (*Id.* ¶ 51). Based on all the information gathered, Mr. Dawson concluded that Kinsella took Defendant's tent and stakes home for personal use in violation of the COBC. (*Id.*). For this reason, on January 22, 2015, Mr. Dawson directed Mr. Begley to place Kinsella on a suspension pending termination, a contemplated termination decision, for violating the COBC for theft. (*Id.* ¶ 52).

On February 15, 2015, Defendant held a union-management review board hearing under the labor agreement, affording Kinsella another opportunity to explain why she had taken Defendant's property home without permission. (*Id.* ¶ 53). Kinsella attended the review board

hearing with representatives from the Union. (*Id.*). During the review board hearing, Kinsella again admitted that she took home company property – the tent - without permission. (*Id.* ¶ 54).

Following the hearing, Mr. Dawson believed that Kinsella did not have a reasonable explanation for her actions. (*Id.* ¶ 55). Mr. Dawson did not change his opinion that Kinsella took the tent home without permission, for personal use, and that this was an act of theft in violation of the COBC. (*Id.*). Mr. Dawson, Ms. Simms, and Mr. Siegel ultimately agreed that Kinsella would be terminated for violating the COBC, and that the termination decision should be upheld. (*Id.* ¶ 56).

**C.     Kinsella's Equal Employment Opportunity Commission ("EEOC") Charges**

On February 25, 2013 – while on paid leave for her arm injury – Kinsella dual-filed a Charge of Discrimination with the EEOC and the Illinois Department of Human Rights, alleging Illinois Bell discriminated against her because of her disability. (*Id.* ¶ 26). On September 13, 2013, while still on paid leave, Kinsella amended her Charge of Discrimination to add claims for sex discrimination and failure to accommodate (together, with the February filing, "the 2013 EEOC Charge"). (*Id.* ¶ 27).

On July 16, 2015 – following her termination – Kinsella filed another Charge of Discrimination, reasserting claims from her prior Charges and asserting a retaliation claim. (*Id.* ¶ 58).

Following EEOC's Dismissal and Notice of Rights, issued on September 11, 2018, Kinsella refiled her claims in this Court. (Dkt. 1).

## <u>LEGAL STANDARD</u>

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). Summary judgment "requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in his favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). *See also Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.") (internal citations omitted).

## DISCUSSION

### I. ADA Claim

Kinsella claims Illinois Bell violated the ADA by failing to provide her with reasonable accommodations for her disabilities – namely, her migraines and broken arm. *See* 42 U.S.C. § 12101, *et seq.* To maintain a failure to accommodate cause of action under the ADA, a plaintiff must show that: (1) she is a "qualified individual with a disability;" (2) the defendant knew of the disability; and (3) the defendant failed to reasonably accommodate her disability. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 682 (7th Cir. 2014) (citing *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)). Defendant argues that Plaintiff has not submitted sufficient evidence to create a triable issue as to the qualified individual and reasonable accommodation requirements.

8

### A.    Kinsella's Disabilities

An individual is disabled under the ADA where (1) she has a physical or mental impairment that substantially limits one or more of her major life activities; (2) she has a record of such an impairment; or (3) she is regarded as having such an impairment by her employer.  42 U.S.C. § 12102(1).  Determining whether an individual is disabled within the meaning of the ADA is a fact-specific inquiry.  *See DePaoli v. Abbott Labs.*, 140 F.3d 668, 672 (7th Cir. 1998).  In this case, a reasonable jury could find that Kinsella was disabled under the statute, since Illinois Bell regarded her as having a substantial impairment in two respects.

The record shows that Kinsella has a history of chronic migraines.  (Dkt. 79 ¶¶ 8–9).  While employed with Illinois Bell, Kinsella sometimes sought medical attention at a hospital for her migraines (*Id.* ¶ 8) and was also known to miss work due to this condition (*Id.* ¶¶ 18–19).  Defendant provided Kinsella workplace accommodations to help manage her migraine symptoms.  (*Id.* ¶ 9).  For example, Kinsella regularly took migraine-related leave under the FMLA during her time as a technician.  (*Id.*).  Illinois Bell clearly knew that Kinsella suffered from migraines and that they sometimes interfered with her work.  (*Id.* ¶ 8).  Illinois Bell was similarly aware that Kinsella injured her arm in 2013, leading the company to place her on short-term disability leave while she healed.  (*Id.* ¶¶ 11–12).

Based on these facts, a reasonable jury could find that Illinois Bell regarded Kinsella as having impairments – chronic migraines and a broken arm – that substantially limited one or more of her life activities, and that Kinsella was therefore disabled within the meaning of the statute.

### B.    Qualified Individual

To state a claim under the ADA, Kinsella must demonstrate that she was a "qualified individual" when she sought workplace accommodations.  An individual is "qualified" if she is

able "to perform the essential functions of the job, with or without reasonable accommodation." 42 U.S.C. § 12111(8); *Gratzl v. Office of Chief Judges*, 601 F.3d 674, 679 (7th Cir. 2010); *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001). The issue here is whether Kinsella's stated disabilities rendered her unable to perform the "essential functions" of her job as a technician.

To determine whether a particular duty is an essential function, the Court considers "[the employee's] job description, [the] employer's opinion, [the] amount of time spent performing the function, [the] consequences for not requiring the individual to perform the duty, and past and current work experiences." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 819 (7th Cir. 2004) (citing *Emerson v. N. States Power Co.*, 256 F.3d 506, 512–13 (7th Cir.2001)); *accord* 29 C.F.R. § 1630.2(n)(3). Kinsella's job description as a technician at Illinois Bell generally entailed "installing and repairing facilities at customer sites to deliver telecommunications services to customers." (Dkt. 72 ¶ 5). Plaintiff acknowledges that the work of a technician is "physically demanding." (*Id.*). Technicians are required to "work outdoors in inclement weather; use tools and other equipment; carry and lift heavy equipment; hoist their bodies to ascend and descend poles and ladders; work aloft; and operate company trucks." (*Id.*). The job description also lists "lifting up to 100 pounds." (*Id.*).

To the extent that Kinsella requested accommodations for her migraine-related disability, she is a qualified individual. There is no evidence to suggest that Kinsella could not perform the physical labor that her position entails on account of her migraines. If she was accommodated with time off when she suffered from a migraine, she was able to return to work and fulfill her job duties. Certainly there could potentially come a point where migraines could prevent her from doing all of her duties; but here, they were sporadic enough to allow her to complete her job duties the vast majority of the time.

Conversely, Kinsella's arm injury precluded her from carrying out many technician duties. Kinsella could not "us[e] her right arm, including no gripping, lifting, or carrying with the right arm" per doctor's orders. (*Id.* ¶ 21; Dkt. 73-3 at 113:10–114:8). Kinsella does not dispute that at the time she was placed on leave in January 2013, her injury prevented her from working at full capacity for a time. (*Id.* at 114:8 ("I could not fully do my job [following my arm injury]."), 149:5–18 ("I couldn't come to work [following my arm injury]. . . . I couldn't work until I had surgery.")). Kinsella claims she could eventually work "to a point." (*Id.* at 151:4–16). For example, she asserts that she could drive after her cast was removed. (*Id.* at 151:4–16). Kinsella also argues that she could have done various tasks around the worksite, including "clean[ing] Xboxes;" "clean[ing] out pedestals;" "return[ing] pie;" "work[ing] in the tool room;" and "help[ing] other technicians." (*Id.* at 115:2–11). But operating company trucks is just one part of her overall job duties as a technician, and the menial chores she lists are not the sort of skilled work technicians are trained, and paid, to do. These tasks also elide the "physically demanding" work that is an Illinois Bell technician's bread and butter. (Dkt. 72 ¶ 5). Beyond that, it is clear that Kinsella could not fulfill her essential responsibilities as a technician without use of her right arm. Kinsella is thus not an ADA "qualified individual" with respect to her arm injury. *Miller v. Ill. Dep't of Corrs.*, 107 F.3d 483, 485 (7th Cir. 1997) ("[A] disabled employee will not be qualified for the position unless he can perform enough of [the various duties of a job] to enable a judgment that he can perform its *essential* duties.") (emphasis in original). Illinois Bell therefore had no obligation to provide Kinsella reasonable accommodations for her arm injury under the ADA. Out of an abundance of caution, the Court will nonetheless analyze Kinsella's challenge to the reasonableness of Defendant's proffered accommodation for Kinsella's arm injury below.

**B.    Reasonable Accommodations**

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," except where the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). S*ee Bombard v. Fort Wayne Newspapers, Inc*., 92 F.3d 560, 563 (7th Cir. 1996) ("Unlawful discrimination under the ADA includes both discriminatory discharge and the failure to provide reasonable accommodation."). In judging what actions an employer must take to accommodate an employee's disability, "[i]t is plain enough what 'accommodation' means. . . . The difficult term is 'reasonable.' " *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995). The ADA defines "reasonable accommodation" as:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). While the reasonableness of a requested accommodation is generally a question of fact, *Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 896 (7th Cir. 1996), certain legal standards exist: "An accommodation is reasonable if it is both efficacious and proportional to the costs to implement it. An accommodation is unreasonable if it imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of the program." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002) (citations omitted). When a qualified individual requests an accommodation, "[i]t is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Jay v. Intermet Wagner, Inc.*,

233 F.3d 1014, 1017 (7th Cir. 2000); *see also Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 546 (7th Cir. 2008).

Illinois Bell does not contend that accommodating Kinsella's disabilities would have imposed upon it an undue hardship in and of itself. Instead, Defendant asserts that it provided Kinsella with reasonable accommodations from the outset.

### i. Accommodations for Kinsella's Migraines

On March 21, 2014, Kinsella initiated an accommodation request for her migraine headaches, requesting up to 5 days off per month. (Dkt. 72 ¶ 38). Defendant declined this request, but approved her for up to sixteen monthly hours of paid leave. (*Id.*). Through this plan, Kinsella could elect to use her time in as little as two-hour increments. (*Id.*; Dkt. 78 at 3 (explaining that the two-hour increments feature allowed Kinsella "flexibility to take time-off as needed"). Kinsella alleges this was not a reasonable accommodation because her preferred accommodation of five days paid leave per month was not burdensome.[2] (Dkt. 71 at 5).

Illinois Bell's accommodation enabled Kinsella to enjoy equal employment opportunities. This is principally because Kinsella's sixteen hours of time-off effectively accommodated her. *See, e.g.*, *Turner v. Saloon, Ltd.*, 491 F. Supp. 2d 753, 763 (N.D. Ill. 2007) (summarily dismissing plaintiff's accommodation claim where employer proffered a "viable" accommodation), *aff'd*, 595 F.3d 679 (7th Cir. 2010). The record provides no indication that the accommodation she received was ever deficient for her needs (i.e., that she required more than sixteen hours of paid leave). To the contrary, Kinsella admits she generally did not need five full days of leave per month, as she

---

[2] Plaintiff appears to argue that because she did not always use all five days of her FMLA leave when they were available to her, it would not burden Defendant to continue providing her five days of leave under an ADA accommodation. (Dkt. 71 at 5). But the ADA does not provide for the sort of maintenance of effort of FMLA assistance that Kinsella suggests. Rather, the ADA requires employers to assess employees' needs and provide reasonable accommodations to eligible individuals. As discussed below, Defendant met this obligation.

requested. (Dkt. 71 at 5 ("[I] did not need five days every month.")). Nor was Kinsella ever denied time-off when she requested leave due to her migraines. (Dkt. 73-3 at 107:3–6, 156:4–7). The record would therefore compel a jury to find that Defendant provided Kinsella with an effective accommodation – defeating Kinsella's argument against summary judgment. The fact that Kinsella did not receive the specific accommodation she requested does not render Defendant's action unreasonable. *Bunn*, 753 F.3d at 683 (explaining that where an employer provided a reasonable accommodation, plaintiff's "apparent displeasure with the way in which [the employer] decided on that accommodation, or with its failure to provide the exact accommodation he would have preferred, [was] irrelevant").

Finally, Kinsella's ideal accommodation – five days of paid leave per month – was not reasonable under the ADA. The ADA covers accommodations that allow employees to "perform the essential functions of the employment position," but "[n]ot working is not a means to perform the job's essential functions." *Hamm v. Exxon Mobil Corp.*, 223 F. App'x 506, 508–09 (7th Cir. 2007) (quoting *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) ("Attendance is an essential aspect of most jobs.")). As Defendant points out, five days of paid leave per month would reduce Kinsella's hours by about 25%, at least in those months that Kinsella took all five days of paid leave. (Dkt. 58 at 6). This would effectively transform Kinsella's role into one with occasional part-time hours. This is not "reasonable" under the ADA. "[R]eassignment to a permanent part-time position is not a reasonable accommodation." *Hoffman v. Zurich Fin. Servs.*, 2007 WL 4219414, at *5 (N.D. Ill. Nov. 28, 2007).

## ii. Accommodations for Kinsella's Broken Arm

Kinsella maintains that Illinois Bell "offered no accommodation" whatsoever when she injured her arm. (Dkt. 71 at 7). She argues that her placement on short-term disability leave was

"not an accommodation, but just a requirement under the terms of the parties' collective bargaining agreement." (*Id.* at 6). This is an improper view of the facts. When Kinsella injured her arm, she took a paid disability leave from January 2013 through January 2014. (Dkt. 72 ¶ 24). The leave was made possible through her employer's benefits plan under ERISA; Defendant explains that "the terms of the plan determine eligibility for benefits, not the [collective bargaining agreement]." (Dkt. 78 at 6). Kinsella resumed her full-time role as a technician at the end of her leave period. (Dkt. 72 ¶ 25). Kinsella's paid leave constitutes an ADA accommodation. *See, e.g.*, *Amadio v. Ford Motor Co.*, 238 F.3d 919, 928–30 (7th Cir. 2001) (examining reasonableness of medical leave accommodation requests under company's sick leave policy); *Schwab v. N. Ill. Med. Ctr.*, 42 F.Supp.3d 870, 883–84 (N.D. Ill. 2014) (finding that leaves of absence may constitute reasonable accommodations); *see also Criado v. IBM Corp.*, 145 F.3d 437, 443 (1st Cir. 1998) (explaining that leaves of absence paid pursuant to company policy may be considered reasonable accommodations).

A separate question is whether Kinsella's placement on disability leave reasonably accommodated her. Plaintiff contends that her paid time off was unreasonable because she could have been assigned to light duty work like certain other employees.[3] (Dkt. 79 ¶¶ 13–14). She argues that Defendant should have tasked her with "walking detail" or "splicing jobs with a partner," or reassigned her to another role altogether. (Dkt. 71 at 7). Kinsella also suggested in deposition testimony that she "could've cleaned out Xboxes," "cleaned out pedestals," "returned pie," "worked in the tool room" or "gone and helped other technicians." (Dkt. 73-3 at 115:2–11).

---

[3] Kinsella points to two male employees she alleges worked light duty assignments. (Dkt. 79 ¶¶ 13–14). Her allegations pertaining to those individuals will be discussed further below. For purposes of her accommodation claim, suffice it to say that Kinsella has not adduced evidence on this point that would preclude summary judgment.

Assignment to light duty work attracted Kinsella because she could not accrue FMLA leave and pension contributions while on disability leave. (Dkt. 71 at 9).

As above, Kinsella's claim is doomed by the fact that she received an effective accommodation. *See, e.g.*, *Mobley*, 531 F.3d at 546; *Turner*, 491 F. Supp. 2d at 763. Her accommodation was effective because she received steady income and time to heal while she could not work at full capacity. This finding stands even though disability leave may have been less advantageous to Kinsella then light work, in terms of her ability to accrue FMLA leave and pension contributions. *Mays*, 301 F.3d at 872 (7th Cir. 2002) (affirming summary dismissal, holding that though the proffered accommodation was not a "perfect substitute" for plaintiff's ideal situation, it was still reasonable). Kinsella's argument is also flawed because she fails to adduce evidence showing that Illinois Bell had any light duty vacancies for her to fill during the relevant timeframe. (Dkt. 72 ¶ 25; Dkt. 78 at 5; Dkt. 79 ¶ 14). However, an employer need not create a new job to reasonably accommodate an employee. *Gratzl,* 601 F.3d at 680; *see also Harris v. Steel Warehouse*, 3:17-CV-465-PPS, 2019 WL 3935328, at \*5 (N.D. Ind. Aug. 19, 2019) (dismissing plaintiff's accommodation claim where plaintiff provided no facts that the light duty jobs they preferred were available). Finally, menial tasks like cleaning Xboxes or returning pies are not befitting of the skilled work that Illinois Bell technicians perform, so cannot be considered reasonable accommodations for Kinsella; Illinois Bell was not required to strip Kinsella's technician role of its principal duties to accommodate her injury. *Gratzl,* 601 F.3d at 680. In light of these facts, Illinois Bell fully performed its obligations under the ADA.

Kinsella last argues that Defendant failed its statutory duty to engage in a "flexible, interactive process" in providing accommodations for her arm injury. (Dkt. 71 at 6). However, the ADA does not establish a separate cause of action for a failure of that interactive process.

*Bunn*, 753 F.3d at 683; *Rehling v. City of Chi.*, 207 F.3d 1009, 1015–16 (7th Cir. 2000). "The ADA seeks to ensure that qualified individuals are accommodated in the workplace, not to punish employers who, despite their failure to engage in an interactive process, have made reasonable accommodations." *Id.* at 1016. Although Kinsella may justifiably be frustrated with the process by which Defendant decided on the accommodations it would provide, that issue is irrelevant for summary judgment.

## II.      Kinsella's Sex Discrimination Claim

Title VII's antidiscrimination provision makes it "unlawful . . . for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under the framework set forth in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016), a Title VII claim survives summary judgment if the plaintiff presents evidence that, "considered as a whole," would allow a reasonable jury to find that her protected characteristic or activity caused an adverse employment action. *Id.* at 765.

To state a sex discrimination claim, Kinsella may utilize the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In a *McDonnell Douglas* inquiry, Kinsella must first establish a *prima facie* case of discrimination – namely, by showing evidence showing that she (1) belonged to a protected class, (2) met her employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was similarly situated to other employees who were not members of the protected class and who were treated better. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). Coworkers are "similarly situated" if they are "directly comparable to the plaintiff in all material respects." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 395 (7th Cir. 2010) (internal quotation

omitted). As a matter of common sense, "this inquiry typically examines whether the individuals dealt with the same supervisor, were subject to the same standards, or engaged in similar conduct." *Larson v. Portage Twp. Sch. Corp.*, 293 F. App'x 415, 419–20 (7th Cir. 2008). If Kinsella makes a *prima facie* case, Illinois Bell must then articulate a non-discriminatory reason for its challenged action, which Kinsella can overcome only by showing that explanation is a pretext for discriminatory animus. *Id.*

Kinsella's sex discrimination claim fails at the *prima facie* stage because she adduces no evidence that any similarly situated man received more favorable treatment than she did. Her allegations surround her rejected request for a light duty work accommodation following her arm injury. (Dkt. 71 at 9). Kinsella avers that certain male technicians "had received and were receiving" light duty assignments; that Defendant therefore could have offered her the same types of assignments; and that Defendant rejected her request on the basis of her sex. (*Id.* at 9–10; Dkt. 72 ¶ 23; Dkt. 79 ¶¶ 13–14). Kinsella cites two employees in support of this claim: Walt Tracy and an unnamed man in the Defendant's McHenry office. (*Id.* ¶¶ 13–14). Neither comparator is similarly situated to Kinsella.

First, Tracy's job requirements were dictated by a collective bargaining agreement that differed from Kinsella's. (*Id.* ¶ 13). Under that agreement, and unlike Kinsella, Tracy's job description expressly excludes climbing for work purposes. (*Compare* Dkt. 72 ¶ 5 (admitting Kinsella's job included "hoist[ing her] bod[y] to ascend and descend poles"), *with* Dkt. 73-2 at 142:2–13 (explaining Tracy's labor agreement explicitly stated he did not have to climb for work given a medical condition relating to a "bad leg")). Tracy and Kinsella also worked at different jobsites. Kinsella worked in Defendant's Blackhawk garage, while Tracy worked in the Villa Park garage. (Dkt. 79 ¶¶ 2, 13). Mr. Tracy was therefore not similarly situated to Kinsella.

18

The unnamed male employee based in Defendant's McHenry office is also not a proper comparator. This individual received his accommodation in or around 2019 – more than five years after Kinsella requested light duty – under a disability program implemented years after Kinsella's termination. (Dkt. 73-2 at 38:8–39:22). Kinsella is also distinct from the McHenry employee because they worked at different job sites. (*Compare* Dkt. 72 ¶ 6 ("Kinsella worked out of the Company's garage in Westmont"), *with* Dkt. 79 ¶ 14 (describing that the comparator worked in McHenry)). These facts distinguish Kinsella apart from her second, and final, comparator.

Absent evidence of any similarly situated men who received better treatment from Defendant, the Court must grant Defendant's motion for summary judgment. *David*, 846 F.3d at 227 (holding that the plaintiff's failure to identify a "similarly situated" comparator meant that she "failed to establish a *prima facie* case of discrimination under Title VII").

Even if Kinsella pled a prima facie case of sex discrimination, she fails to show that Defendant's proffered, non-discriminatory reason for denying her light duty work was mere pretext. To do so, Kinsella "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [Illinois Bell's] asserted reasons that a reasonable person could find them unworthy of credence." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 724 (7th Cir. 2018) (internal quotation marks omitted). "Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 743–44 (7th Cir. 2011) (alterations and internal quotation marks omitted), *overruled on other grounds by Ortiz*, 834 F.3d at 764–65.

When Illinois Bell declined Kinsella's light duty request, it instead placed Kinsella on a paid, short-term disability leave. (Dkt. 79 ¶ 12). Illinois Bell offered a non-discriminatory reason for its decision: inter alia, there were simply no light duty vacancies suitable for technicians at that

time.  (Dkt. 72 ¶ 23; Dkt. 59-1 ¶ 13).  Kinsella has submitted no evidence to suggest that Defendant's reasoning here was dishonest, aside from her subjective belief that she was denied her preferred accommodation because she is a woman.  *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 548 (7th Cir. 2011) ("If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.") (internal quotation marks omitted).  The record would not allow a reasonable jury to find that Illinois Bell's asserted sex-neutral justification for its decision was insincere, further warranting summary judgment on this claim.

## III.    Kinsella's Retaliation Claims

The ADA and Title VII prohibit discrimination against any individual who opposed a practice illegal under their provisions, including in the form of retaliation.  42 U.S.C. § 12203; 42 U.S.C. § 2000e–3(a).  To survive summary judgment on her retaliation claims under the ADA and Title VII,[4] Plaintiff must offer evidence of " '(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two.' "  *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007)), *aff'd*, 553 U.S. 442 (2008).  Defendant does not dispute that Plaintiff engaged in a statutorily protected activity when she filed the 2013 EEOC Complaint.

An action is "materially adverse" if it injures or harms an employee to such a degree that the employee might stop his or her protected activity.  *Poullard v. McDonald*, 829 F.3d 844, 857 (7th Cir. 2016).  The test to determine whether an act is materially adverse is objective and depends on the circumstances of each case.  *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (citing

---

[4] Cases cited in the discussion below are retaliation cases brought under both Title VII and the ADA.  The language in the anti-retaliation provision in the ADA is similar to the language in the anti-retaliation provision in Title VII. *Casna v. City of Loves Park*, 574 F.3d 420, 426–27 (7th Cir. 2009).  Thus, courts may consider Title VII cases when reviewing ADA claims.  *Id.*

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69 (2006)). Examples of actions that rise to the level of an adverse action include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 456 (7th Cir. 2011). An employee's dissatisfaction with their employer's action does not make it adverse. *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001).

A causal connection between the protected act and the adverse action exists when the evidence as a whole is sufficient "to permit a reasonable fact finder to conclude that retaliatory motive caused the [action]." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). Evidence that retaliatory motive exists includes "suspicious timing, ambiguous statements, . . . other bits and pieces from which an inference of [retaliatory] intent might be drawn, [and] evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently." *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 869 (7th Cir. 2013) (internal quotations and citations omitted).

Even if a plaintiff successfully shows she suffered adverse actions and proves causation, a defendant can escape liability if it provides non-retaliatory explanations for the adverse actions. *See Lord*, 839 F.3d at 564; *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). A plaintiff then must show that the explanations are pretext for retaliation. *Lord*, 839 F.3d at 564; *Argyropoulos*, 539 F.3d at 736. "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Lord*, 839 F.3d at 564 (citations and internal quotation marks omitted). An employer's justification for terminating a worker can be "foolish or trivial or even baseless, as long as [it is] honestly

21

believed." *Id.* (citations and internal quotation marks omitted). To allege pretext, the plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the explanation "that a reasonable person could find [it] unworthy of credence." *Coleman v. Donahoe*, 667 F.3d 835, 853 (7th Cir. 2012) (citation and internal quotation marks omitted). "Summary judgment is appropriate only if a reasonable fact finder would be compelled to believe [the defendant's] explanation." *Lord*, 839 F.3d at 564 (citing *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005)).

Kinsella alleges that, in response to her 2013 EEOC Charge, Illinois Bell carried out three distinct acts of retaliation against her: (1) it "refuse[d] to present her with opportunities to acquire the on-the-job training;" (2) it "deprive[d] her of the necessary tools to do the jobs that offered overtime opportunities; and (3) it ultimately terminated her employment. (Dkt. 71 at 13–14). Defendant argues, inter alia, that Kinsella cannot establish causation and that certain challenged actions were not materially adverse. Further, Defendant provides non-retaliatory explanations for each of its challenged actions. (Dkt. 78 at 10–14). The Court reviews each of the purported retaliatory acts in turn.

### A.     Deprival of On-The-Job Training

Kinsella alleges that Illinois Bell "refus[ed] to present her with opportunities to acquire the on-the-job training Defendant considered essential to" performing certain overtime work activities. (Dkt. 71 at 13–14; *see also* Dkt. 79 ¶ 7). Specifically, Kinsella alleges she was not afforded sufficient on-the-job training to become proficient at repairing cut cable; employees proficient at repairing cut cable are able to work valuable overtime hours; and she was the only NIBS technician at her worksite who filed a charge of discrimination with the EEOC. (Dkt. 71 at 12–13).

Kinsella fails to adduce evidence establishing causation. Nothing in the record shows that the individual responsible for allocating on-the-job training opportunities at her worksite – Mr. Begley, (Dkt. 79 ¶¶ 2, 6–7) – knew of her 2013 EEOC Charge. Instead, the record is undisputed that Mr. Begley had no knowledge of Kinsella's 2013 EEOC Charge. (Dkt. 73-1 at 142:16-18). Because Mr. Begley could not have retaliated against Kinsella because of that Charge, her claim necessarily fails. *See, e.g.*, *Wackett v. City of Beaver Dam, Wis.*, 642 F.3d 578, 583 (7th Cir. 2011) (affirming summary judgment for employer where plaintiff could not establish causation, since he did not show that any of the defendants knew of his protected activity); *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) (dismissing plaintiff's retaliation claim because the decision-maker did not know about the protected activity at the time of the adverse action).

Kinsella moreover fails to develop the factual record necessary to show she suffered a materially adverse action with respect to on-the-job-training. At the outset, Kinsella admits that she *was* provided on-the-job training related to repairing cut cable. (Dkt. 73-3 at 40:15–19; 42:22–24 ("Q. So you had on-the-job training on cut cables; right? A. Yes.")). She also has no evidence that the on-the-job training allegedly denied to her was available or given to other technicians at her worksite. These gaps in the record provide further reason to grant summary judgment on this count. *Bauers v. Bd. of Regents of Univ. of Wis.*, 33 F. App'x 812, 817–18 (7th Cir. 2002) ("This court is not obligated to construct arguments for the parties, or comb the record to find factual support for their assertions. When a party fails to develop the factual and legal basis for a claim . . . the arguments are deemed waived.").

### B. Failure to Provide Tools

Kinsella next claims that Illinois Bell "depriv[ed] her of the necessary tools to do the jobs that offered overtime opportunities." (Dkt. 71 ¶ 14). Ultimately, Kinsella alleges that Illinois Bell kept only one piece of equipment from her: a work tent specifically assigned to Kinsella. (Dkt. 79 ¶ 17). She argues that she was unfairly treated because other technicians were provided their own tents. (*Id.* ¶ 11). And although Illinois Bell has a tool sharing policy – under which its employees share tools on an as-needed basis – Kinsella claims that "certain tools [are] more apt for sharing than others," suggesting the policy placed an unfair burden her. (*Id.*). Defendant argues that its action was not materially adverse and that Kinsella fails to demonstrate causation. (Dkt. 78 at 11).

Kinsella's argument fails for several reasons. First, Defendant's failure to provide tools was not a materially adverse action. Kinsella has not presented any evidence that the tool sharing policy resulted in reduced pay, diminished career prospects, or a negatively altered workplace. *Barton*, 662 F.3d at 456. The record shows that Kinsella understood that Illinois Bell required *all* of its technicians to share equipment as necessary. (Dkt. 72 ¶ 36). Kinsella also acknowledges "if any technician needed a tent, the Company stored extra tents in the garage for their use." (*Id.* ¶¶ 35–36). She also admits that she was always able to obtain tools necessary for her work assignments; her workflow was never stifled due to lack of adequate equipment. (*Id.* ¶ 37; Dkt. 59-6 at Illinois Bell 141 ("I did get a job where I needed a tent. I did not have a tent so I used the tent from the vehicle next to mine assigned to [a colleague who was out on disability].")). No reasonable jury could find that Kinsella suffered a materially adverse action under these facts, because they stem from a company policy that affected every employee and because it did not materially harm Kinsella, in any case. For the same reasons, no evidence shows that Kinsella's experience having to share a tent would dissuade a reasonable actor from engaging in protected activity. *Poullard v. McDonald*, 829 F.3d 844, 857 (7th Cir. 2016). Kinsella was clearly frustrated

with the tool sharing policy as it pertained to tent assignments – but "not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an . . . employee did not like would form the basis of a" retaliation claim. *Coffey-Sears v. Lyons Twp. High Sch. Dist. 204*, No. 15-cv-08642, 2017 WL 1208439, at *10 (N.D. Ill. Mar. 31, 2017) (quoting *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001)). *See also Burlington*, 548 U.S. at 68 (explaining that "minor annoyances . . . do not deter employees from reporting discrimination" and therefore are not materially adverse actions). No reasonable fact finder could determine that requiring Kinsella to borrow tools now and then (as she had successfully done in the past) was materially adverse.[5]

There is also no causal link between Kinsella's 2013 EEOC Charge and Defendant's refusal to provide her a tent. Kinsella's request for a new tent was denied by Mr. Begley. (Dkt. 59-5 ¶ 6). Again, Kinsella has no evidence that Mr. Begley was even aware of her 2013 EEOC Charge before he denied her request. Her protected activity therefore could not have sparked retaliatory animus in Mr. Begley.

## C. Termination

Finally, Kinsella claims that Illinois Bell terminated her employment in retaliation for filing her 2013 EEOC Complaint.[6] (Dkt. 71 at 14–15). The parties do not dispute that termination

---

[5] Kinsella cursorily argues that company tents were not part of the tool sharing policy, suggesting it was out of the ordinary and thus retaliatory for the company to require her to share other employees' tents. (Dkt. 71 at 13 ("When her request for a tent was denied, her fellow technicians directed Ms. Kinsella to use one of the old tents in the garage, not to borrow a tent from a fellow technician. Thus, these clearly were not part of the amorphous 'tool sharing' program.")). But there is no there there: The record is rife with undisputed evidence indicating that it was not at all unusual for technicians to use tents that were not specifically assigned to them. For instance, Kinsella admits that "if any technician needed a tent, the Company stored extra tents in the garage for their use." (Dkt. 72 ¶ 35).

[6] Kinsella also argues for the first time in her Response in Opposition that her accommodation requests constitute a second category of protected activity that may give rise to an inference that her termination was retaliation. (Dkt. 71 at 16). However, Kinsella waived this claim by failing to raise it in her complaint. (Dkt. 1). *Warren v. Solo Cup Co.*, 516 F.3d 627, 629 n.3 (7th Cir. 2008) (affirming dismissal of a claim not raised in the complaint, deeming it waived); *Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004) ("[A] plaintiff may not amend her complaint through allegations made in response to a motion for summary judgment."). Accordingly, this claim is dismissed.

constitutes a materially adverse employment action. Defendant first argues, however, that the two-year lapse in time between Kinsella's protected action in 2013 and her termination in 2015 precludes a finding of causation. (Dkt. 58 at 2, 12–13; Dkt. 72 ¶ 56). Kinsella counters that the relevant timeframe in the causation inquiry begins on January 22, 2015, when Mr. Siegel learned that Kinsella's 2013 EEOC Charge was still pending. (Dkt. 71 at 15; Dkt. 79 ¶ 29). She argues that Defendant's retaliatory motive is shown by the fact she was fired less than one month later, on February 17, 2015. (Dkt. 79 ¶¶ 29, 31).

Kinsella's argument is unavailing for several reasons. Illinois Bell is correct that the temporal gap between Kinsella's protected activity and her termination undermines any inference of causation. Here, Kinsella's protected activity took place two years prior to Defendant's adverse employment decision. Because of this long gap in time, the two events cannot be considered causally linked. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) (noting that an inference of retaliation can be weakened by "a lengthy time period between the protected activity and the alleged retaliation"); *see also EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 952–53 (7th Cir. 2001) (affirming summary judgment where six-week gap between protected activity and termination was insufficient to establish retaliation); *Jasmantas v. Subaru-Isuzu Auto., Inc.*, 139 F.3d 1155, 1158 (7th Cir. 1998) (affirming summary judgment where there was a three-month gap between protected activity and employee's termination).

Kinsella's reasoning about Mr. Siegel's January 22 revelation is muddled. Defendant commenced its investigation into Kinsella's suspected misconduct on January 14, 2015 – over a week before Mr. Siegel learned about Kinsella's open EEOC complaint, and therefore would have gained any purported animus. (Dkt. 72 ¶¶ 47–48). *Wackett*, 642 F.3d at 583. Regardless, Defendant explained that the company's legal and human resources departments routinely consult

with each other before proceeding with termination decisions, which explains why Mr. Siegel inquired into whether Kinsella had any pending EEOC charges. (Dkt. 79 ¶ 29; Dkt. 73-2 at 120:9–22).

Even if Kinsella were able to make out a *prima facie* case of retaliation, however, she would be unable to cast doubt on Defendant's non-retaliatory explanation for the termination—namely, Kinsella's theft of company property. Kinsella was fully aware that it violated workplace policy to misuse or steal company property. (Dkt. 73-3 at 63:5–18). She acknowledged that she could not "take company property" or "use company property for personal use." (Dkt. 59-6 at Illinois Bell 148). She also understood that she could be disciplined – even terminated – for failing to adhere to company policy. (Dkt. 73-3 at 53:8–11). Indeed, Mr. Begley explained that "any time a person has . . . a company asset, company property, at their home, it's . . . a big no-no. It could lead to . . . disciplinary action up to termination. . . . [I]t's a big red flag." (Dkt. 73-1 at 130:15–131:9).

It is undisputed that Kinsella brought company property home without permission. (Dkt. 72 ¶ 54 ("Admitted that Kinsella admitted in the review board hearing that she took home the company property . . . without permission.")). She removed a company tent from her worksite and mounted it in her backyard on January 9, 2015. (Dkt. 73-3 at 205:11–14). The tent remained there for several days. (*Id.* at 205:6–17 (noting the tent was up in her backyard for at "least five days"); Dkt. 59-6 ¶ 5 (noting Defendant observed the tent in Kinsella's backyard on January 14, and removed the items on January 15)). The record shows that the tent's monetary value especially concerned Defendant; Mr. Dawson explained that it was "the seriousness of [Kinsella's] offense," in that "she stole a $450 tent and other things from the company," that motivated disciplinary action leading to her termination. (Dkt. 73-2 at 136:1–11). In addition to the tent, Kinsella brought

home a company-issued repair kit, (Dkt. 59-6 at Illinois Bell 141), and two of Defendant's wooden stakes (*Id.* at Illinois Bell 149). Kinsella does not dispute that she put the wooden stakes to personal use, namely to "make sure the boulder in front of [her] house did not roll into [a] sewer." (Dkt. 73-3 at 231:9–12; Dkt. 59-6 at Illinois Bell 149).

Because Kinsella took company property home without permission, Defendant launched an asset protection investigation and disciplinary proceedings against Kinsella, ultimately leading to her termination. (Dkt. 59-1 ¶¶ 16–17; Dkt. 59-6 ¶¶ 2–3; Dkt. 72 ¶ 55 (noting that Defendant concluded Kinsella took the tent home without permission and for personal use, and considered this an act of theft in violation of company policy)). Plaintiff has no evidence suggesting that Defendant erred from its standard policies and procedures in the course of these events, or that Defendant otherwise pursued this course of action as a vehicle for retaliation.

Without more evidence, the jury could *speculate* that Defendant acted with retaliatory animus, but a jury could not *reasonably infer* that it is more likely than not that Defendant terminated Plaintiff out of retaliation rather than because Kinsella apparently stole an expensive item from her worksite. *See Senner v. Northcentral Tech. Coll.*, 113 F.3d 750, 757 (7th Cir. 1997) (distinguishing between a reasonable inference from mere speculation and holding that "[a] party needs more than a scintilla of evidence . . . to defeat summary judgment"). For the foregoing reasons, no reasonable jury could find that Kinsella's conduct was pretext for retaliation. Her retaliation claim fails.[7]

---

[7] Turning to Kinsella's concern that Defendant's "decision to terminate rested solely on the report from a disgruntled neighbor, inadmissible double hearsay in this action," (Dkt. 71 at 15): For all the reasons stated herein, this argument lacks merit. The record clearly shows that Illinois Bell terminated Kinsella because it determined that she misappropriated company property. The fact that Kinsella's neighbor may have alerted Illinois Bell to Kinsella's misconduct, triggering the internal investigation and disciplinary action that followed, is immaterial.

Throughout her pleadings, Kinsella emphasizes that she did not intend to steal the company tent. (*See, e.g.*, Dkt. 71 at 15; Dkt. 72 ¶ 54). The Court acknowledges Kinsella's desire to set the record straight on this point, but clarifies that her intent is not at issue in this retaliatory termination action. Instead, dispositive of her claim is *Defendant's* intent – what matters is whether Illinois Bell legitimately sought to address Kinsella's apparent misconduct, or if its true goal was to punish Kinsella for filing her 2013 EEOC Charge. As explained above, the record strongly supports Defendant's claim that it terminated Kinsella solely in response to her removal of company property in January 2015. Even if Defendant *mistakenly* believed that Kinsella stole or misused its property, the question at bar is whether Defendant *honestly* believed its claimed version of events to be true at the time it took action. *Bodenstab v. Cty. of Cook*, 569 F.3d 651, 657 (7th Cir. 2009) (explaining that an employer's honest justification for a decision will not be considered pretext simply because it was "mistaken, ill considered, or foolish") (citation omitted). Accordingly, the Court makes no finding of fact as to whether Kinsella intended to keep the company tent. The law nonetheless requires dismissal of her claim.

## **CONCLUSION**

Defendant Illinois Bell's motion for summary judgment [57] is granted as to all counts.

Virginia M. Kendall
United States District Judge

Date: August 24, 2021